Case 4:97-cv-04063   Document 161   Filed in TXSD on 09/27/99   Page 1 of 47

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
ENTERED

AUG 2 7 1999

Michael N. Milby, Clerk of Court

INTEGRATED GPS TECHNOLOGIES, INC. §
    a Texas corporation, §
                       §
    Plaintiff, §
                       §     Civil Action No. 97-4063
  v. §
                       §
CHICAGO MAP CORPORATION, §
    an Illinois corporation, §
                       §
    Defendant. §

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

      The above entitled and numbered cause came on for jury trial on August 3, 1999,

At the close of the plaintiff's case, the defendant filed a Motion for Judgment as a Matter

of Law pursuant to Rule 50(a)(1) of the Federal Rules of Civil Procedure.  After

considering the testimony during trial, examining the proofs offered by the parties,

considering the arguments of counsel, the Court determined that Defendant's Rule 50(a)

Motion should be granted.  The Court makes the following findings of fact and conclusions

of law based upon the evidence adduced at trial.  If anything herein designated as a finding

of fact is actually a conclusion of law, or vice versa, the same is hereby adopted as such.

### I.
### FINDINGS OF FACT

**A.    NATURE OF THE CLAIMS**

1.    This case involves claims of Federal trademark infringement and Federal unfair



CitiPDF - www.texia.com

competition, common law trademark infringement and alleged violations of the Texas Anti Dilution statute.

2. The plaintiff has made no other claims of unfair competition, nor any claims of misappropriation of trade secrets, patent infringement or misappropriation of technology.

## B. JURISDICTION AND VENUE

3. The plaintiff, Integrated GPS Technologies, Inc. ("IGT") is located in Stafford, Texas.

4. The defendant, Chicago Map Corporation, is located in Lemont, Illinois.

5. The Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §1331 and §1338, and 15 U.S.C. §1501, et seq, and 15 U.S.C. §1121.

6. This Court has supplemental jurisdiction over the plaintiff's Texas state law claims pursuant to 28 U.S.C. §1367 and 28 U.S.C. § 1332.

7. This Court has personal jurisdiction over the parties, because the plaintiff is located within this judicial district and the defendant transacts business in this judicial district.

8. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a), (b) and/or §1391 (c), because a substantial part of the alleged events or omissions giving rise to the claims have occurred in this judicial district.

## C. THE PARTIES

9.   Integrated GPS Technologies ("IGT") is owned by Steven and Rochelle Honkus.

10.  IGT's president is Steven Honkus.

11.  Rochelle Honkus is an officer of IGT.

12.  Prior to the formation of IGT, Steven Honkus operated the business as Honkus & Associates, Inc. ("H&A"), a subchapter S corporation.

13.  Today, both H&A and IGT sell the GPS-LINK software.

14.  The president and founder of Chicago Map Corporation is Steve Peskaitis.

15.  Mike Barnett is an employee of Chicago Map Corporation.

**D.   THE PLAINTIFF'S PRODUCT**

16.  IGT  is a consulting firm which also sells a computer software product named "GPS-LINK."

17.  The plaintiff's GPS-LINK software product links GPS hardware to other mapping software programs.

18.  The plaintiff's GPS-LINK product sells for $495.00.

19.  The plaintiff's GPS-LINK *Professional* sells for $995.00.

20.  The plaintiff has sold fewer than 30 units of GPS-LINK *Professional*.

21.  The plaintiff's GPS-LINK *Lite* sells for $95.00.

22.  The plaintiff has sold less than ten (10) units of GPS-LINK *Lite* to date.

23.  GPS-LINK *Lite* was not introduced until after this lawsuit was filed.

24.  The plaintiff and its predecessor, H&A, have collectively sold fewer than 200 units

3

of all GPS-LINK products since 1993.

25.    Steven Honkus testified that the plaintiff's product is not a stand alone product.

26.    Since the product is not a stand alone product, the user must purchase both a GPS receiver and other computer mapping software to operate the plaintiff's product.

27.    In his testimony, Steven Honkus did not identify a single retail outlet where the plaintiff's product is sold.

**E.    THE DEFENDANT'S PRODUCT**

28.    The defendant sells an electronic mapping product named "PRECISION MAPPING™".

29.    PRECISION MAPPING™ is computer software which allows the user to electronically display maps on a computer screen to find destinations and to navigate courses.

30.    In June 1997, the defendant released its PRECISION MAPPING™ v.3.0 which contained a feature described as a "GPS Link." This release was the first time the defendant's product contained a GPS feature, and the first time it was described as a "GPS Link."

31.    From June 1997 until May 1998, the defendant's PRECISION MAPPING™ v.3.0 and v.3.0.1 used the phrase "GPS Link" to describe a feature embedded within the PRECISION MAPPING™ program.

32.    The defendant's PRECISION MAPPING™ v.3.0 and v.3.0.1 are the only versions

4

of PRECISION MAPPING™ which had a feature described as a "GPS Link."

33.  PRECISION MAPPING™ v.3.5 was released in June 1998.

34.  PRECISION MAPPING™ v.3.5 did not contain a feature described as a "GPS Link."

35.  The defendant released PRECISION MAPPING™ v.4.0 in early 1999. This product does not contain a feature described as a "GPS Link."

36.  The defendant's PRECISION MAPPING™ v.3.0 and 3.0.1 used the phrase GPS Link to describe a feature -- an electronic "link" within the software.

37.  The feature described as a GPS Link within PRECISION MAPPING™ v.3.0 and 3.0.1 allowed the user of the PRECISION MAPPING™ software to connect that software to a hand-held Global Positioning System ("GPS") receiver.

38.  The GPS Link feature had to be specifically loaded by the user of the PRECISION MAPPING™.

39.  The GPS Link feature within the PRECISION MAPPING™ is incapable of operating separately from the PRECISION MAPPING™ software.

40.  The GPS Link feature within PRECISION MAPPING™ has never been identified on any box or display.

41.  The GPS Link feature within PRECISION MAPPING PRECISION™ will not operate by itself.

42.  The GPS Link feature within PRECISION MAPPING™ cannot be loaded into a

CVisPDF - www.fasina.com

computer without also loading the PRECISION MAPPING™ software program.

43. The defendant's PRECISION MAPPING™ software sold for retail prices ranging from $29.95 to $49.00.

**F.   THE GLOBAL POSITIONING SYSTEM**

44. The Global Positioning System is comprised of twenty-four (24) satellites which emit radio signals which are received by GPS receivers on the ground.

45. By receiving signals from at least three satellites simultaneously, a GPS receiver can calculate the user's exact location on the ground.

**G.   THE PLAINTIFF'S ALLEGED TRADEMARK IS DESCRIPTIVE**

46. The GPS-LINK name describes the function of the product it purports to represent.

47. Honkus testified that the plaintiff's product links a GPS receiver to other windows based applications, so that the user can interface data from the GPS hardware with the other applications to display imagery on the computer screen.

48. Steven Honkus testified that he named the plaintiff's software "GPS-LINK."

49. Steven Honkus testified that he chose the name "GPS-LINK" to describe the function of the plaintiff's software.

50. "GPS" is a generic acronym for the Global Positioning System.

51. "Link" is a common, generic term in the computer software industry to refer to a connection or interface between systems.

52. There are thousands of references to the term "Link" on the Internet and in the

6

marketplace.

53. There are thousands of references to the term "GPS" used in the marketplace and on the Internet.

## G.   THE PLAINTIFF'S ALLEGED MARK IS NOT SUGGESTIVE

54. There was no evidence introduced at trial that the plaintiff's mark is suggestive.

## H.   SECONDARY MEANING

### (1)   Empirical Evidence of Widespread Consumer Recognition

55. The plaintiff did not present any survey evidence that a substantial number of consumers identified the name "GPS-LINK" with the plaintiff.

56. The plaintiff presented only five witnesses to identify "GPS-LINK" with Steven Honkus, Honkus & Associates or IGT.

57. Gretchen Hartley testified that she works for Trimble Navigation, a GPS receiver manufacturer.

58. Hartley testified that she identifies the name GPS-LINK with the plaintiff.

59. Robert Jackson testified that he works for a crop dusting company called Farm & Ranch Aerial Service.

60. Jackson uses GPS-LINK along with a GPS receiver, a mapping engine and mapping data, to mark precise locations for pesticide application by crop duster airplanes.

61. Jackson testified that he identifies the name GPS-LINK with the plaintiff.

62. Gerry Kawalec testified that he is an engineer for Equilon Pipeline which is a joint

CVisPDF - www.fasiisa.com

venture between Shell and Texaco.

63. Kawalec uses GPS-LINK along with a GPS receiver, a mapping engine and mapping data, to locate and plot locations of underground pipelines.

64. Kawalec testified that he identifies GPS-LINK with the plaintiff.

65. Charles Moon testified that he works for Forestry Application Services in Union Springs, Alabama.

66. Forestry Application Services is in the business of applying fertilizer on young trees by air.

67. Moon uses GPS-LINK along with a GPS receiver, a mapping engine and mapping data, to plot on a map the locations of pine beetle infestation in forests.  Moon also testified that he uses GPS-LINK to track planes during the aerial application of fertilizer.

68. Moon testified that he identifies the name GPS-LINK with the plaintiff.

69. Gerald Creager testified that he works for Texas A&M University.

70. Creager uses GPS-LINK, along with a GPS receiver, a mapping engine and mapping data, to track cattle ticks on roaming herds of cattle.

71. Creager testified that he identifies GPS-LINK with the plaintiff.

72. Creager also testified that he did not personally purchase the plaintiff's GPS-LINK product.

(2)     **Duration and Exclusivity of the Mark's Use**:

73.   The plaintiff began using the name "GPS-LINK" in October 1993.

74.   The plaintiff has used the term "GPS-LINK" since 1993.

75.   The plaintiff has always used the term "GPS-LINK," to describe its product the same way, always in all capital letters, and always with a hyphen.

76.   The defendant first used the term "GPS Link" to describe a feature of its PRECISION MAPPING™ v.3.0 software in May 1997.

77.   The defendant stopped using the term "GPS Link" to describe the GPS Link feature within the PRECISION MAPPING™ software in June 1998.

78.   The term "GPS Link" is used by third parties pervasively on the Internet.

79.   The defendant presented evidence of many references to GPS Link on the Internet at the time this lawsuit was filed in January 1998.

80.   The defendant presented evidence of hundreds of references to GPS Link on the Internet just prior to the time the trial commenced in July 1999.

81.   Steven Honkus admitted that the phrase "GPS Link" is used by third parties on the Internet.

82.   Creager testified that the phrase "GPS Link" has become generic on the Internet.

   **(3)    Amount and Nature of Advertising:**

83.   The plaintiff has spent a total of about $80,000 in advertising all of its products, including the GPS-LINK, since 1993.

84.   Since 1993, the plaintiff placed advertisements for its "GPS-LINK" software product

CVPDF - www.fasiss.com

in several trade publications.

85.     The plaintiff advertises the "GPS-LINK" product on the plaintiff's Internet web site.

86.     The plaintiff testified that since 1993, it attended several trade shows, where it disseminated literature on the GPS-LINK software product.

87.     Steven Honkus identified one trade show in 1996 where he presented a paper on the GPS-LINK software product.

        **(4)     Evidence of Copying**

88.     The defendant's product is called "PRECISION MAPPING™".

89.     The defendant never used "GPS Link" as the name of its product.

90.     The defendant began using the phrase "GPS Link" internally to describe the feature in May, 1996.

91.     The defendant was not aware of the name of the plaintiff's product until at least August or September 1996, several months after it began using the phrase to describe a feature within their software.

92.     Prior to describing the PRECISION MAPPING™ feature as a "GPS Link," the defendant was developing the next version of PRECISION MAPPING™ software which would not contain the GPS Link phrase or feature.

93.     The defendant did not intend to use the GPS Link phrase to describe its GPS feature on a permanent basis.

94.     The defendant did not intend to copy the plaintiff's name, "GPS-LINK."

95.   Steven Honkus and Mike Barnett of Chicago Map Corporation exchanged correspondence regarding their respective products in 1996.

96.   Honkus testified that he contacted Chicago Map because he was interested in finding a mapping solution to offer his clients.

97.   Steven Honkus testified that he met Mike Barnett of Chicago Map Corporation in September 1996 at a trade show.

98.   No relationship was ever formed between the plaintiff and defendant.

        **(5)   Survey Evidence**

99.   The plaintiff presented no survey evidence to establish widespread consumer recognition of the plaintiff's mark.

        **(6)   Third Party Use**

100.   The term "GPS Link" is used extensively by third parties on the Internet.

101.   Steven Honkus admitted the term "GPS Link" is used by third parties on the Internet.

102.   The defendant presented evidence of many references to GPS Link on the Internet at the time this lawsuit was filed in January 1998.

103.   The defendant presented evidence of hundreds of references to GPS Link on the Internet in July 1999, just days before the trial began.

104.   Gerald Creager himself uses the phrase GPS Link in his own web page.

105.   The phrase GPS LINK has been used by Delorme in a mapping software product

11

called AAA MAP'N'GO.

106. Microsoft has used the phrase GPS Link in connection with its mapping features.

107. GPS-PRO™ Map has used the phrase GPS Link to describe a feature in its mapping program.

108. DeLorme also used GPS-Link on the name of a Map Expert software product. The product was called GPS LINK II

109. To this day, DeLorme still uses the phrase GPS Link in connection with the advertising, promotion and sale of its mapping products.

110. Norcon Technology, Ltd. has used, and is still using the phrase "GPS Link" in connection with the advertising, promotion and sale of its ARCNAV™ software containing electronic mapping charts.

111. Modulaire uses the GPS Link name as a feature in connection with its MODULINK and ACCULINK software.

112. Global Star uses the phrase GPS Link in connection with the advertising and sale of its ASSET MAP™ software.

## I.     LIKELIHOOD OF CONFUSION

### (1)     Strength of the Plaintiff's Mark

113. The plaintiff claims a trademark in the name "GPS-LINK" for its software product.

114. The plaintiff's software product links a GPS receiver to other windows based applications.

12

115.  The plaintiff always uses the term "GPS-LINK" in the same way, with all capital letters and with a hyphen.

116.  Steven Honkus testified that he named the "GPS-LINK" product.

117.  Steven Honkus testified that he chose the name "GPS-LINK" because it described what the software does.

118.  The plaintiff presented no survey evidence.

119.  The plaintiff presented just five witnesses who testified that they recognized "GPS-LINK" as the plaintiff's product.

120.  The term "GPS Link" is used by third parties on the Internet.

121.  The defendant presented evidence of many references to GPS Link on the Internet at the time this lawsuit was filed in January 1998.

122.  The defendant presented evidence of hundreds of reference to GPS Link on the Internet just prior to the time the trial commenced in July 1999.

   **(2)   Similarity of the Marks**

123.  The plaintiff always uses the term "GPS-LINK" in the exact same way to identify its product.

124.  The plaintiff always spells the term GPS-LINK with all capital letters <u>and</u> a hyphen.

125.  The defendant sells its computer software under the name "PRECISION MAPPING™."

126.  The defendant never used the phrase "GPS-LINK" in the exact same way as the

13

plaintiff, with all capital letters and a hyphen.

127. The defendant used the phrase "GPS Link" with lowercase and capital letters and without a hyphen.

128. On a few occasions, the defendant used the phrase "GPS LINK" with all capital letters, but never with a hyphen.

129. The defendant has never sold a product named "GPS-LINK."

130. The defendant has never sold a product named "GPS LINK."

131. The defendant has never sold a product named "GPS Link."

132. The defendant never displayed the feature described as a "GPS Link" on PRECISION MAPPING™ v.3.0 or v.3.0.1 packaging.

133. The feature within PRECISION MAPPING™ v.3.0 and v.3.0.1 described as a "GPS Link" has never been sold separately.

134. The feature within PRECISION MAPPING™ v.3.0 and v.3.0.1 described as a "GPS Link" cannot be used without purchasing the PRECISION MAPPING™ software.

(3)   **Similarity of the Products**

135. Steven Honkus testified that the plaintiff's product links a GPS receiver to a windows based software program on a computer.

136. In order to use the plaintiff's product to display imagery on the computer, the consumer must always purchase GPS hardware, another windows based software

program called a mapping engine, and street level mapping data.

137. The plaintiff's product is not a mapping program.

138. Honkus testified that the plaintiff's product is designed to track multiple vehicles at a time and do fleet navigation with the aid of a GPS receiver.

139. The defendant's PRECISION MAPPING™ computer software product is a stand-alone mapping program.

140. PRECISION MAPPING™ computer software contains computerized maps which can be used on a personal computer for trip planning and similar purposes.

141. The GPS feature within PRECISION MAPPING™ has the ability to connect a GPS receiver to PRECISION MAPPING™ only.

142. The GPS feature within PRECISION MAPPING™ cannot be connected to any other software.

143. PRECISION MAPPING™ software cannot track multiple vehicles.

144. PRECISION MAPPING™ software cannot track multiple locations for fleet usage.

145. PRECISION MAPPING™ software can only track the user's location on the mapping data in PRECISION MAPPING™ software.

146. Steven Honkus testified that the plaintiff's GPS-LINK software cannot be used to connect a GPS receiver to PRECISION MAPPING™.

147. The plaintiff's GPS-LINK product is typically sold for sophisticated engineering, tracking and navigation purposes.

148.   The plaintiff's GPS-LINK product sells for $495.00.

149.   The plaintiff's GPS-LINK *Lite* sells for $95.00, but the plaintiff has only sold ten (10) units of GPS-LINK *Lite*.

150.   The plaintiff's GPS-LINK *Professional* product sells for $995.00.

151.   The plaintiff's GPS-LINK product cannot function on its own. The user must also purchase a GPS receiver, a mapping engine (either MapInfo or Arcview), and street level mapping data.

152.   The plaintiff sells only two compatible mapping engines called MapInfo for $1295.00, and Arcview for $995.00.

153.   The plaintiff's intended user must also purchase street level mapping data, which is an additional $495.00.

154.   The plaintiff's intended user must also purchase a high end GPS receiver, which cost approximately $200.00 to $300.00, or more.

155.   Ultimately, the plaintiff's user will pay between $1500.00 to $2500.00 just to be able to use the GPS-LINK to track vehicles or locations on a map.

156.   The defendant's PRECISION MAPPING™ product sells for retail ranging from $29.95 to $49.00.

157.   The defendant's PRECISION MAPPING™ v.3.0 and v.3.0.1 product can be used with virtually any GPS receiver, even inexpensive hand-held models costing $79.00.

16

### (4)   Identity of Retail Outlets and Sophistication of Purchasers

158.   The plaintiff's GPS-LINK software product is not sold in retail outlets.

159.   Steven Honkus could not identify a single retail outlet where GPS-LINK software is sold.

160.   The plaintiff's product is sold primarily directly to end users by the plaintiff.

161.   The defendant's products were primarily sold at retail to consumers.

162.   There are no dealers which sold both the plaintiff's product and the defendant's product.

163.   The plaintiff has sold less than 200 pieces of its software under the GPS-LINK name since it was first developed in 1993.

164.   The defendant's PRECISION MAPPING™ software product sells for $29.95 at retail outlets such as CompUSA, Egghead Software and book stores.

165.   Plaintiff's witness Gerald Creager bought his copy of PRECISION MAPPING™ in a college bookstore.

166.   The defendant's PRECISION MAPPING™ software product can be purchased over the Internet and by mail order from direct mail.

167.   The plaintiff sells its product to large corporations and researchers interested in fleet tracking and navigation.

168.   Each of the plaintiff's witnesses, Hartley, Jackson, Moon, Kawalec and Creager testified that they or their customers spent considerable time -- months and even

17

years -- shopping for software to fit their needs, before choosing the plaintiff's GPS-LINK software product.

169. Each of the plaintiff's witnesses, Hartley, Jackson, Moon, Kawalec and Creager testified they or their customers spent thousands of dollars to obtain a system, which includes the plaintiff's GPS-LINK software, for fleet tracking on land or sea. For example, Jackson's customers typically spend $12,000 per airplane for the navigation system including the GPS-LINK product.

170. The plaintiff's customers are sophisticated. Creager uses the GPS-LINK product in university level research. Kawalec is an engineer who uses the GPS-LINK product to locate underground pipelines. Jackson uses the product as part of a sophisticated airplane navigation system to mark precise locations for pesticide application. Moon also uses the GPS-LINK product in a sophisticated airplane navigation system. Allen testified he uses the GPS-LINK product for quality control purposes in the manufacturing of sophisticated electronic guidance systems.

171. Defendant's customers are not necessarily sophisticated consumers. Defendant's software can be an impulse buy. Donnie Allen testified that he purchased the defendant's PRECISION MAPPING software for $29.95.

172. Donnie Allen testified that he purchased the PRECISION MAPPING™ to "check it out" because it didn't cost much and was easy to get.

(5) **Identity of Advertising Media**

18

173. The plaintiff presented evidence that its product was named or advertised in several trade publications since 1993.

174. The plaintiff presented evidence that it attended certain trade shows where the GPS-LINK software was promoted.

175. The plaintiff identified one trade show in 1996 where Steven Honkus presented a paper on his company and the GPS-LINK product.

176. The plaintiff presented marginal evidence that the plaintiff and defendant advertise GPS-LINK and PRECISION MAPPING™ side by side. Although the defendant's PRECISION MAPPING™ software product was listed in one or two of the same publications, the parties' products were listed in different product categories.

177. There was no evidence that the defendant used the GPS Link phrase in any publication in which the plaintiff advertised its product.

178. There was no evidence that the plaintiff and defendant have ever exhibited side by side or near each other at a trade show.

179. The plaintiff has spent a total of $80,000.00 in advertising all of its products for the entire period since 1993.

180. The defendant has invested more than $1 million promoting its PRECISION MAPPING™ products.

181. The defendant has not advertised its feature described as a GPS Link to any customers, except in one product sheet distributed to about fifty professional buyers

for retail stores.

### (6)   The Defendant's Intent

182.   The defendant's product is trademarked as "PRECISION MAPPING™".

183.   The defendant did not sell any product called GPS Link.

184.   The defendant testified that it began using the phrase "GPS Link" internally to
       describe  the GPS feature prior to May 1996.

185.   The defendant testified that prior to describing the GPS feature within PRECISION
       MAPPING™ as a  "GPS Link," it was developing the next version of PRECISION
       MAPPING™ software which would not contain the GPS Link phrase or feature.

186.   The plaintiff testified that he met Mike Barnett of Chicago Map Corporation in
       September 1996 at a trade show.

187.   No relationship was ever formed between the plaintiff and defendant.

188.   The defendant was unaware the plaintiff was using the GPS-LINK name prior to
       September 1996.

### (7)   Actual Confusion

189.   Not one witness testified that he or she was actually confused as to the source of the
       defendant's product.

190.   One witness, Donnie Allen testified that long after he purchased PRECISION
       MAPPING™, he called Steven Honkus regarding an unrelated issue. Allen testified
       that after he and Honkus discussed the reason for the call, Allen asked if the

plaintiff had licensed his product to the defendant, but did not state that he was confused.

191.   Allen did not testify that he purchased PRECISION MAPPING™ thinking it was from IGT.

192.   In fact, Allen knew the PRECISION MAPPING™ product was from Chicago Map because he already owned prior versions of the software.

193.   Not one witness testified that they purchased the defendant's product thinking it was the plaintiff's, or vice versa.


Based on the above findings of fact, the Court makes the following conclusions of law:

## II.
## CONCLUSIONS OF LAW

### A.   STANDARD OF REVIEW FOR A MOTION FOR JUDGMENT AS A MATTER OF LAW

1.   If, after the plaintiff has been fully heard on an issue, there is still no legally sufficient evidentiary basis for a reasonable jury to find for the plaintiff on that issue, this Court may determine the issue against the plaintiff and may grant a motion for judgment as a matter of law. Fed. R. Civ. P. 50(a)(1).

2.   The Court will consider all of the evidence presented in the light most favorable to the non-moving party. Waymire v. Harris County Texas, 86 F.3d 424, 427 (5th Cir.

ChkPDF - www.texlia.com

1996)

3.    A Rule 50(a)(1) Motion for Judgment as a Matter of Law is properly granted when the facts and inferences point so strongly in favor of the movant that a rational jury could not arrive at a contrary verdict.  Id. (affirming district court granting of Rule 50(a) motion where facts in record sufficient to remedy hostile work environment), (citing London v. MAC Corp. of America, 44 F.3d 316, 318 (5th Cir. 1995) (holding that judgment as a matter of law proper where, although plaintiff's actual use of the product "may be conceivable," the defendant "could not have reasonably anticipated its use in this fashion")).

4.    A motion for judgment as a matter of law should only be denied if there is *substantial* evidence -- "that is, evidence of such *quality and weight*" that reasonable and fair minded jurors might reach a different conclusion. Robertson v. Bell Helicopter Textron, Inc., 32 F.3d 948, 950 (5th Cir. 1994) (emphasis added) (entry of judgment as matter of law affirmed where there was insufficient evidence of defendant's knowledge of protected activity to support finding of retaliatory intent in retaliation claim), cert. denied, 513 U.S. 1154, 115 S. Ct. 1110, 130 L.Ed.2d 1075 (1995); Murray v. Red Kap Industries, Inc., 124 F.3d 695, 698-99 (5th Cir. 1997) (affirming district court's grant of judgment as a matter of law in favor of employer where there was insufficient evidence that the plaintiff's infections rendered her unable to work; and where there was no evidence that plaintiff

received subsequent treatment); <u>Price v. Marathon Cheese Corp.</u>, 119 F.3d 330, 335-36 (5th Cir. 1997) (affirming district court's grant of judgment as a matter of law where there was a lack of evidence that the fired employee was actually incapacitated during her absence from work).

5.    Furthermore, the test is not whether the plaintiff has presented *any* evidence supporting its case. There must be a conflict in substantial evidence to create a jury question. <u>Boeing Company v. Shipman</u>, 411 F.2d 365, 374-75 (5th Cir. 1969) (mere scintilla of evidence is insufficient to present a question for the jury), <u>overruled on other grounds</u>, <u>Gautreaux v. Scurlock Marine, Inc.</u>, 107 F.3d 331 (5th Cir. 1997). As Wright & Miller state:

> Federal courts do not follow the rule that a scintilla of evidence is enough to create an issue for the jury. The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury properly could find a verdict for that party.

Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 2524 (internal citations omitted) (1995 ed.).

## B.    TYPES OF TRADEMARKS

6.    For the purposes of trademark law, marks have traditionally been arranged into five categories: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful. <u>Sunbeam Products, Inc. v. West Bend Co.</u>, 123 F.3d 246, 252 (5th Cir.

CVisPDF - www.fesiio.com

1997) (citing <u>Two Pesos, Inc. v. Taco Cabana</u>, 505 U.S. 763, 768, 120 L.E2d 615, 112 S. Ct. 2753, 23 U.S.P.Q.2d 1081 (1992)). "This hierarchy determines the degree of trademark protection to which a given mark is entitled. The latter three categories are considered inherently distinctive, because their intrinsic nature serves to identify a particular source of a product." <u>Id.</u>  (citing <u>Two Pesos</u>, 505 U.S. at 768.) Only suggestive, arbitrary and fanciful marks are in and of themselves protectable. <u>Id</u>.

7.    As the Fifth Circuit observed, an inherently distinctive mark is presumed immediately to serve as an identifier of source from the very first moment it is used. <u>Taco Cabana International, Inc. v. Two Pesos, Inc.</u>, 932 F.2d 1113, 19 U.S.P.Q.2d 1253 (5th Cir. 1991), <u>aff'd</u>, 505 U.S. 763, 120 L.E2d 615, 112 S.Ct. 2753, 23 U.S.P.Q.2d 1081 (1992).

8.    An example of a strong, distinctive mark is KODAK or EXXON. These are not word in the English language and they immediately identify the source of the product. <u>Eastman Kodak Co. v. Rakow</u>, 739 F. Supp. 116, 16 U.S.P.Q.2d 1631, 1632 ("The Kodak trademark is perhaps one of the strongest and most distinctive trademarks in this county, if not in the world."). <u>See</u> <u>also</u>, <u>Arroe Distilleries, Inc. v. Globe Brewing Co.</u>, 117 F.2d 347, 48 U.S.P.Q. 157 (4th Cir. 1941) (BLACK & WHITE arbitrary for scotch whiskey); <u>Stork Restaurant v. Sahati</u>, 166 F.2d 348, 76 U.S.P.Q. 374 (9th Cir. 1948) (STORK CLUB held arbitrary for night club).

9.  In contrast, descriptive marks are not considered inherently distinctive "because they do not inherently identify a particular source." Sunbeam Products, Inc., 123 F.3d at 252 (quoting Two Pesos, 505 U.S. at 769).

10. "Accordingly, descriptive marks are entitled to protection only if they have come to be uniquely associated with a particular source, thereby acquiring a secondary meaning." Id. This is true under each theory the plaintiff has advanced. Id.; Zatarains, Inc. v. Oak Grove Smokehouse, Inc., 698 F.2d 786, 793-94, 217 U.S.P.Q. 988 (5th Cir. 1983); King-Size, Inc. v. Frank's King Size Clothes, Inc., 547 F. Supp. 1138, 1155 (S.D. Tex. 1982).

11. Furthermore, a generic mark is not protected under any circumstances because it does not refer to a particular product or source, "but solely to the genus of which the particular product is a species. Id., quoting Two Pesos, 505 U.S. at 768 (quoting Park 'n' Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194, 105 S. Ct. 658, 661, 83 L.Ed2d 582 (1985))). Examples of generic terms include "ASPIRIN" (acetyl salicylic acid); "CELLOPHANE" (transparent cellulose sheets and films); "COLA" (type of soft drink); "MATCHBOX" (toy cars in matchbox-sized boxes); "YO-YO" (return top). King-Size, Inc., 547 F. Supp. at 1151-52, n. 6 (providing an extensive list of generic terms).

## C.  THE PLAINTIFF'S MARK IS DESCRIPTIVE

12. The Court finds that the plaintiff's mark is not fanciful, arbitrary or inherently

distinctive. The plaintiff's alleged mark is not inherently distinctive because it does not immediately identify the source of the product from the very first moment it was used. Two Pesos, Inc., 505 U.S. at 768. Rather, the Court finds that the plaintiff's mark is descriptive.

13. "A mark is descriptive if it describes the intended purpose, function or use of the goods, the size of the goods, the class of users of the goods, a desirable characteristic of the goods, the nature of the goods, or the end effect on the user." McCarthy, Trademarks and Unfair Competition, §11:16 (4th ed.). Aloe Creme Laboratories, Inc. v. Estee Lauder, Inc., 533 F.2d 256, 195 U.S.P.Q. 471 (5th Cir. 1976) (mark AFTER TAN for after sunning lotion is descriptive); Aloe Creme Laboratories, Inc. v. Milsan, Inc., 423 F.2d 845, 165 U.S.P.Q. 37 (5th Cir. 1970) (mark ALO for cream of aloe plant found descriptive); American Heritage Life Ins. Co. v. Heritage Life Ins. Co., 494 F.2d 3, 182 U.S.P.Q. 77 (5th Cir. 1974) (HERITAGE life insurance plan deemed descriptive where court found that "heritage for heirs of the insured" is a dubious characterization); King-Size, Inc. v. Frank's King Size Clothes, Inc., 547 F. Supp. 1138 (S.D. Tex. 1982) (KING SIZE is descriptive for larger men's clothes); Home Sav. of America v. Home Sav. Assoc., 219 U.S.P.Q. 157 (S.D. Tex. 1982) (HOME SAVINGS is descriptive mark for saving and loan services); Vision Center v. Opticks, Inc., 596 F.2d 111, 202 U.S.P.Q. 333 (5th Cir. 1979) (No effort required to determine VISION CENTER

is place that one can get glasses; mark is descriptive, not suggestive, and no secondary meaning proven); B & S Underwriters Inc. v. Clarendon National Insurance Co., 36 U.S.P.Q. 2d 1769 (W.D. La 1995) (mark THE ALTERNATE PLAN for workers' compensation program, though registered, is descriptive and has not acquired secondary meaning); Union National Bank of Texas, Laredo, Texas v. Union National Bank of Texas, Austin, Texas, 16 U.S.P.Q. 2D 1129 (5th Cir. 1990) (mark UNION NATIONAL BANK and UNION NATIONAL BANK OF TEXAS descriptive as matter of law and therefore not protected absent secondary meaning); Texas Dairy Queen Operators Council v. Feed Store Inc., 1 U.S.P.Q. 2D 1804 (N.D. Tex. 1986) (finding that TEXAS COUNTRY was a descriptive and weak mark).

14.   Furthermore, there is no rule of law that to be held "merely descriptive," a term must describe the product with absolute exactness. In re Entenmann's, Inc., 15 U.S.P.Q.2d 1750 (T.T.A.B. 1990) (OATNUT on bread does not tell exactly what type of nut is used, but is nonetheless descriptive since it informs buyers with the required degree of particularity of two important ingredients).

15.   Under the Lanham Act, one of the tests to determine whether a given mark is "merely descriptive" is based upon what the mark would mean to the potential customer when applied to the plaintiff's goods. McCarthy, Trademarks and Unfair Competition, §11:51 (4th ed.). Thus, the type of potential customers and their

particular vocabulary is relevant in determining descriptiveness, and the proper test is of descriptiveness of a word is its meaning to that class of buyers who are prospective purchasers. If a product is marketed to technically knowledgeable buyers, it is the buyers' understanding of the designation that determines whether or not it is descriptive. McCarthy, supra, §11:20 (citing In re Intelligent Instrumentation, Inc., 40 U.S.P.Q.2d 1792 (T.T.A.B. 1996) (VISUAL DESIGNER is descriptive to "sophisticated and technically knowledgeable purchasers and users" of computer programs that permit custom programming applications to be visually designed instead of written in programming language)); See also, Hayes Microcomputer Products, Inc. v. Business Computer Corp., 219 U.S.P.Q. 634 (T.T.A.B. 1983) (INTELLIGENT MODEM for computer modem deemed descriptive because "intelligent" is "computerese" to describe an advanced type modem having sophisticated features).

16.   The common definitions of the words also dictate a finding of descriptiveness. "GPS" is an acronym for the Global Position System, and "link" is term commonly used in the computer industry to refer to a connection or interface between two systems. Common definitions are an "appropriate and relevant indication of the ordinary significance and meaning of words to the public," Zatarains, supra at 792. This is "at least preliminary evidence" that a term is descriptive of the product "in the sense that the words naturally direct attention to the purpose or function of the

28

product." <u>Id</u>.

17. After applying the facts adduced at trial to these tests, the Court finds that the plaintiff's mark is descriptive. "GPS" is an acronym for the Global Position System; "Link" is a term commonly used in the computer industry to describe a connection or interface between systems. "GPS-LINK" describes the function of the software: to link computer software to a GPS receiver. Honkus testified that GPS-Link links computer software to a GPS receiver.

18. The plaintiff claims its mark is suggestive, not descriptive. While a descriptive term directly and clearly conveys information about the qualities or characteristics of a product, "a suggestive term suggests, rather than describes some particular characteristic of the goods or services to which it applies and requires the consumer to exercise the imagination in order to draw a conclusion as to the nature of the goods and services." <u>Zatarains, Inc.</u>, 698 F.2d at 791 (citing <u>Soweco, Inc. v. Shell Oil Co.</u>, 617 F.2d 1178, 1184 (5th Cir. 1980)); <u>see</u> <u>also</u>, <u>Railroad Salvage of Conn., Inc. v. Railroad Salvage, Inc.</u>, 561 F. Supp. 1014, 219 U.S.P.Q. 167 (D.R.I. 1983) (RAILROAD SALVAGE for sale of goods from bankruptcy liquidations and discontinued goods held a suggestive term) <u>Levi Strauss & Co. v. R. Josephs Sportswear</u>, 28 U.S.P.Q.2d 1464 (T.T.A.B. 1993) (ACTION SLACKS pants held suggestive); <u>Bose Corporation v. International Jensen, Inc.</u>, 963 F.2d 1517 22 U.S.P.Q.2d 1704 (Fed. Cir. 1992) (ACOUSTIC RESEARCH

loudspeakers held suggestive).

19.   The imagination test "seeks to measure the relationship between the actual words of the mark and the product to which they are applied. If a term 'requires imagination, thought and perception to reach a conclusion as to the nature of goods,' it is considered a suggestive term. Alternatively, a term is descriptive if standing alone it conveys information as to the characteristics of the product. " Zatarains, supra at 792 (quoting Stix Products, Inc. v. United Merchants & Manufacturers, Inc., 295 F.Supp. 479, 488 (S.D.N.Y. 1968)).

20.   Another test used by the courts to determine whether a mark is descriptive v. suggestive is "whether competitors would be likely to need the terms used in the trademark in describing their products." Zatarains, supra at 793 (quoting Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366, 379 (5th Cir. 1976)). Evidence of third party use of the mark to describe products that function similarly to the plaintiff's is relevant in a determination of the descriptiveness v. suggestiveness. Id.

21.   The Court finds that the plaintiff presented no evidence at trial to support its claim of suggestiveness. Mere observation compels the conclusion that the computer software product named "GPS-LINK" links a Global Positioning System (GPS) receiver with a program to display imagery on a computer. Nothing in the name "GPS-LINK" requires the customer to use his or her imagination to discern what the product does, and it does not indirectly suggest the software's function.

30

22.   Under each of the tests described above, the Court finds that the plaintiff's mark is

clearly descriptive, not suggestive. Descriptive marks do not inherently identify a

particular source, and hence cannot be protected unless they acquire distinctiveness

through secondary meaning. Two Pesos, Inc., 505 U.S. at 769; King-Size, Inc.,

547 F. Supp. at 1155. Thus, the Court must determine whether the plaintiff has

proved its mark acquired secondary meaning. Id.

23.   Furthermore, the plaintiff must prove the existence of secondary meaning in its

mark at the time the defendant first used that mark. McCarthy on Trademarks,

§15:4; Perini Corp. v. Perini Const.Inc., 915 F.2d 121 (4th Cir. 1990).

## D.   SECONDARY MEANING

24.   Secondary meaning refers to the mental association in buyers' minds between the

alleged mark and a single source of the product. McCarthy, supra § 15:5.

25.   Secondary meaning is used generally to indicate that a mark or dress "has come

through use to be uniquely associated with a specific source." Two Pesos, Inc., 505

U.S. at 766, n.4 (quoting Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456

U.S. 844, 851, n. 11, 102 S.Ct. 2182, 2187, n.11, 72 L.Ed.2d 606 (1982)).

26.   To support a finding of secondary meaning, the mark must denote to the consumer

"a single thing coming from a single source." Coca-Cola v. Koke Co., 254 U.S.

143, 146, 41 S.Ct. 113, 114, 65 L.Ed. 189 (1920).

27.   It is well accepted that proof of secondary meaning requires substantial evidence of

widespread recognition in the marketplace. <u>King -Size, Inc.</u>, 547 F. Supp. at 1155.

In <u>King-Size</u>, this district court stated that "the chief inquiry is the attitude of the

consumer toward the mark: does it denote to him a 'single thing coming from a

single source'?" <u>Id</u>. at 1156.

28.     The Fifth Circuit has held that empirical proof that the mark has come to be

uniquely associated with a specific source is *necessary* in finding secondary

meaning. <u>Sunbeam Products, Inc. v. West Bend Company</u>, 123 F.3d 246 (5th Cir.

1997). In that case, the Fifth Circuit stated:

> Because the primary element of secondary meaning is 'a
> *mental association* in buyer's minds between the alleged mark
> and a single source of the product,' the determination whether
> a mark or dress has acquired secondary meaning is primarily
> an empirical inquiry. This Court has expressly stated, and the
> Supreme Court has agreed, that the gravamen of the secondary
> meaning determination is 'the empirical question of current
> consumer association.' Accordingly, survey evidence is the
> most direct and persuasive evidence of secondary meaning.

<u>Id</u>. at 253-54 (internal citations omitted) (emphasis in original).

29.     Survey evidence is considered largely to be the "most direct and persuasive

evidence of secondary meaning." <u>Id</u>. at 254 (citing <u>Sno-Wizard Mfg. v. Eismemann

Products Co.</u>, 791 F.2d 423, 427 (5th Cir. 1986)). The plaintiff in <u>Sunbeam</u>, did not

provide survey evidence. The <u>Sunbeam</u> court stated:

> To compensate for the absence of empirical survey evidence,
> Sunbeam proffered a variety of evidence to show secondary

meaning. We have recognized that consumer surveys are not the only evidence relevant to the determination of secondary meaning. In addition, the court may consider the length and manner of the use of a mark, the nature and extent of advertising and promotion of the mark, the sales volume of the product, and instances of actual confusion. Nevertheless, the ultimate determination whether a particular mark or dress has acquired secondary meaning remains an empirical question of consumer association.

Id. (internal citations omitted).

30.    The Restatement takes the position that it is sufficient if secondary meaning has been achieved in the minds of a "significant number" of prospective purchasers. Restatement (Third) of Unfair Competition §13, comment e. Furthermore, McCarthy writes:

> One federal court stated: 'Proof of secondary meaning requires more than proof of the existence of one person or even a relatively small number of people who associate the term with a single source.' Another court indicated that survey evidence showing that 25% of the interviewees connected plaintiff's mark with a single source was insufficient proof of secondary meaning.

McCarthy, supra at § 15:45 (1999) (citing Wembley Inc. v. Diplomat Tie Co., 216 F.Supp. 565, 137 U.S.P.Q. 107 (D. Md. 1963)).   Norm Thompson Outfitters, Inc. v. General Motors Corp., 448 F.2d 1293, 171 U.S.P.Q. 328 (9th Cir. 1971) (if there is a "sparseness of people" who associate the mark with plaintiff, secondary meaning is not proven); Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F. Supp. 670, 137 U.S.P.Q. 413

(S.D.N.Y. 1963).

31.  The plaintiff produced testimony from just five witnesses to show secondary meaning. Testimony that five persons associate "GPS-LINK" with the plaintiff is insufficient as a matter of law. 20th Century Wear v. Sanmark-Stardust, Inc., 815 F.2d 8, 10 (2nd Cir. 1987) (stating no survey evidence and testimony of two buyers that they recognized the mark as identifying the plaintiff's products falls far short of establishing secondary meaning). In re The Paint Products Company, Inc., 8 U.S.P.Q.2d 1863 (T.T.A.B. 1988) (testimony of ten customers insufficient to establish secondary meaning in term found to be descriptive by the examining attorney); In re Petersen Manufacturing Co., Inc., 2 U.S.P.Q.2d 2032 (T.T.A.B. 1987) (testimony of a few customers insufficient to show acquired distinctiveness).

32.  For their testimony to be persuasive, moreover, the plaintiff should establish that these five witnesses are representative of the product's customers and potential customers. King-Size Inc., supra at 1157. Distributors and manufacturers are not typical of the product's potential customers, and their opinions are therefore irrelevant. McCarthy, supra § 15:46 (in most cases, relevant buyer class consists of consumers. Therefore, the state of mind of wholesale or retail distributors or their opinions about consumers is often rejected as irrelevant).

33.  The Court finds that the plaintiff failed to prove that its witnesses were typical customers. For example, two of plaintiff's witnesses track pine beetles and cattle

ticks for business and research. But even if these witnesses are typical consumers, the Court finds that testimony from five consumers falls far short of that which is required to meet the plaintiff's significant burden of proof on this issue. 20th Century Wear, 815 F.2d at 10 (stating no survey evidence and testimony of two buyers that they recognized the mark as identifying the plaintiff's products falls far short of establishing secondary meaning). In re The Paint Products Company, Inc., 8 U.S.P.Q.2d 1863 (T.T.A.B. 1988) (testimony of ten customers insufficient to establish secondary meaning in term found to be descriptive by the examining attorney); In re Petersen Manufacturing Co., Inc., 2 U.S.P.Q.2d 2032 (T.T.A.B. 1987) (testimony of a few customers insufficient to show acquired distinctiveness).

34.    This Court has stated that the following additional factors may also be relevant to determining "whether a [trademark] has acquired secondary meaning: (1) the duration and exclusivity of the [mark's] use; (2) the amount and nature of advertising that emphasizes the [mark] and its distinctive, identifying features; (3) consumer survey evidence linking the [mark] and a single source; (4) the defendant's intent in copying the [mark]."; and (5) third party usage. Pebble Beach Co. v. Tour 18 I, Ltd., 942 F. Supp. at 1559 (citing Duraco Products, Inc. v. Joy Plastic Enterprises, 40 F.3d 1431, 1452 (3d Cir. 1994)); Zatarains Inc., 698 F.2d at 795-96.

35.    The absence of survey evidence weighs heavily against a finding of secondary

meaning. <u>Sunbeam Products, Inc. v. West Bend Company</u>, 123 F.3d at 254; <u>Brown</u>

<u>v. Quiniou</u>, 744 F. Supp. 463 (S.D.N.Y. 1990).

36.     There is no fixed rule as to the length of time a symbol must be in use before it can

achieve secondary meaning. McCarthy on Trademarks, <u>supra</u> at § 15:54. The

plaintiff must prove that it acquired secondary meaning prior to the defendant's first

use of the phrase. McCarthy on Trademarks, <u>supra</u> at § 15:4. The Court finds that

the plaintiff has not established sufficient evidence that it has used the mark for an

adequate length of time, to the exclusion of others, to establish secondary meaning.

37.     Evidence of the nature and extent of publicity and advertising is relevant to the issue

of secondary meaning. <u>Pebble Beach Co.</u>, 942 F. Supp. at 1559 (citing <u>Duraco</u>

<u>Products, Inc. v. Joy Plastic Enterprises</u>, 40 F.3d 1431, 1452 (3d Cir. 1994));

<u>Zatarains Inc.</u>, 698 F.2d at 795-96. In <u>Pebble Beach</u>, this Court stated that

advertisements that "emphasize the relevant trade [mark] may solidify in the minds

of consumers an association between the advertised [mark] and the source of the

[mark]." <u>Pebble Beach Co., supra</u> at 1559 (evidence that the trade dress was

emphasized in numerous advertisements, and had widespread exposure in books,

magazines and on national television, combined with the public's association of the

hole as "the Lighthouse Hole," is strong evidence of secondary meaning). There is

far less evidence in this case of the nature and extent of advertising and publicity

in the marketplace necessary to show secondary meaning. Indeed, the plaintiff has

CMJPDF - www.fastio.com

not provided any evidence that even with its sparse advertising efforts, a substantial portion of the consuming public actually received it. See supra.

38. This Court has held that "evidence of intentional copying does not trigger a presumption of secondary meaning. Rather, such evidence is relevant, but not determinative, of secondary meaning." Pebble Beach I, supra at 1560 (citing Bristol-Meyers Squibb Co. v. McNeil-P.P.C. Inc., 973 F.2d 1033, 1041-41 (2d Cir. 1992)); Schwinn Bicycle Co. v. Ross Bicycles, Inc., 870 F.2d 1176, 1182 n.13 (7th Cir. 1989).

39. The Seventh Circuit, moreover, has stated that evidence of copying must be accompanied by evidence that the copier's intent was to confuse customers as to source or sponsorship:

> Copying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's. In that situation, the defendant's belief that plaintiff's trade dress has acquired secondary meaning -- so that his copying will indeed facilitate his passing off -- is some evidence that the trade dress has acquired secondary meaning.

Thomas & Betts Corp. v. Panduit Corp., 65 F.3d 654, 36 U.S.P.Q.2d 1065 (7th Cir. 1995). The Court finds that the plaintiff has not provided sufficient evidence that the defendant intended to copy its mark. There is no evidence that the defendant intended to "pass off" its PRECISION MAPPING™ product as that of the plaintiff.

40.     The plaintiff has the burden to prove secondary meaning. Additionally, "a high degree of proof is necessary to establish secondary meaning." <u>Pebble Beach I</u>, <u>supra</u> at 1560. This Court finds that considering all of the evidence in the light most favorable to the plaintiff, IGT still has not sustained its burden of proof to establish that the name GPS-LINK has acquired secondary meaning. Because the plaintiff has not proven secondary meaning, its mark is not protectable, and the defendant is entitled to judgment as a matter of law.

41.     To prevail on a claim under the Texas Anti-dilution statute, Tex. Bus. & Co. Code Ann. §16.29, the plaintiff must prove its mark is inherently distinctive or acquired secondary meaning. <u>Id</u>. at 1563-1564.   Because the plaintiff failed to meet its burden of proof on the issue of secondary meaning, the defendant is entitled to judgment as a matter of law on the plaintiff's state and common law claims as well.

## E.      LIKELIHOOD OF CONFUSION

42.     Although the Court's determination that the plaintiff has failed to show secondary meaning issues is fatal to the plaintiff's claims, the defendant has also moved in the alternative for judgment as a matter of law on the likelihood of confusion. For the following reasons, judgment is granted for the defendant on the alternative ground that no likelihood of confusion exists.

43.     The infringement test is "likelihood of confusion". <u>Pebble Beach I</u>, <u>supra</u> at 1561; <u>Joy Manufacturing Co. v. CGM Valve & Gauge Co., Inc.</u>, 730 F. Supp. 1387

(S.D. Tex. 1989). The Fifth Circuit has listed factors to consider when determining likelihood of confusion. These factors are the strength of the trademark; degree of similarity between the two marks; similarity of products; identity of retail outlets and purchasers; identity of advertising media utilized; defendant's intent and actual confusion. Moore Business Forms, Inc. v. Ryu, 960 F.2d 486, 490 (5th Cir. 1992); Chemlawn Services Corp. v. GNC Pumps, Inc., 690 F. Supp. 1560, 1571 (S.D. Tex. 1988), aff'd. 856 F.2d 202 (5th Cir. 1988).

44. Whether a mark is classified as "strong" or "weak" is a "vital consideration in determining the scope of protection it is accorded." Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 259 (5th Cir. 1980). While an inherently distinctive mark is "strong," a descriptive mark is "weak" and is afforded less protection. Elvis Presley Enterprises, Inc. v. Capece, 141 F.3d 188, 201 (5th Cir. 1998) ("The stronger the mark, the greater protection it receives, because the greater the likelihood that consumers will confuse the junior user's use with that of the senior user."). The strength of a mark naturally depends on whether the mark has acquired secondary meaning and is widely recognized by the public. Gilson, Trademark Protection and Practice, § 5.05[6] (1992).

45. Furthermore, evidence of third party use of the mark will dilute the strength of a mark and diminish the likelihood of confusion. Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 259 (5th Cir. 1980); Gilson, supra, § 5.05[5]. The strength of

39

inherently weak trademarks do not ordinarily enjoy the wide latitude of protection afforded owners of strong marks. Standard Inter. Corp. v. American Sponge & Chamois Co., Inc., 394 F.2d 599, 600. This Court has already determined that the plaintiff's mark is descriptive and therefore weak. Thus, the mark is entitled to less protection and there is less likelihood that consumers will be confused.

46.     The Court also considers the degree of similarity of the marks used by both parties. Elvis Presley Enterprises, Inc., 141 F.3d at 201; Pebble Beach, supra at 1561. The relevant inquiry is whether, under the circumstances of use, the marks are sufficiently similar that prospective purchasers are likely to believe that the two sources are somehow associated. Id. However, different meanings of otherwise similar marks may overcome a likelihood of confusion that would otherwise result. Id. (citing McCarthy on Trademarks, §23:26, §23:28.)

47.     Furthermore, "in determining the meaning and connotation which the trademark projects, it is proper to look to the context of use, such as material on labels, packaging, advertising and the like." Id. (citing McCarthy, supra at § 23:26). The Court finds that the defendant did not place the phrase GPS Link on any packaging, advertising or labels for the PRECISION MAPPING™ product. Therefore, there is no likelihood that consumers will be confused by the defendant's use of the phrase within the software.

48.     The degree of similarity with the marks needed to prove likelihood of confusion will

40

vary with the difference in the goods and services of the parties. Where the goods and services are directly competitive, the degree of similarity required to prove a likelihood of confusion is less than in the case of dissimilar products. McCarthy, supra, § 23:20.1.

49.   Furthermore, there is less likelihood of confusion between a stylized mark and the defendant's use of the words without the stylization. McCarthy states that stylized marks "tend to fall in the no likelihood of confusion category." McCarthy, supra § 23:33.  In this case, the plaintiff's mark is stylized, in that it always appears in all capital letters and with a hyphen.  The plaintiff admitted its mark was stylized in its registration application. Because the defendant did not use the phrase "GPS Link" in the same stylized manner as the plaintiff, there is no likelihood of confusion.

50.   The Court also considers the similarity of the plaintiff's and defendant's products in determining likelihood of confusion. Elvis Presley Enterprises, Inc., 141 F.3d at 202; Pebble Beach, supra at 1561. "The greater the similarity between products and services, the greater the likelihood of confusion." Exxon Corp. v. Texas Motor Exch. of Houston, Inc., 628 F.2d 500, 505 (5th Cir. 1980).

51.   Product competition, or the lack of it, is an important factor considered in determining whether confusion is likely. Gilson, Trademark Protection and Practice, §5.05[1] (1992). Infringement is more easily established where the

defendant uses the same or similar mark on the same type of competing product. Id. Conversely, where the products are noncompeting, the degree of trademark similarity necessary to establish likelihood of confusion is increased. Id. This Court finds that the plaintiff's and defendant's products were dissimilar and did not compete. Plaintiff's product sells for $495.00 to highly sophisticated businesses and researchers who conduct fleet navigation and tracking. Defendant's product sells for $29.95 to $49.00 in the local book store to consumers for vacation planning. Because the products are dissimilar and did not compete, there is less likelihood of confusion created by the defendant's use of the phrase to describe a feature within its software.

52.    Plaintiff did not present evidence of a likelihood that the plaintiff intended to expand its products to include the types sold by the plaintiff.   Gilson, supra § 5.05[5] (courts consider whether it is likely that the trademark owner will bridge the gap by expanding his line of trademarked products to include the type of product sold by the defendant).

53.    The Court also considers sophistication of customers in the likelihood of confusion analysis. Pebble Beach, supra at 1561. The more sophisticated the consumers, the less likely they will be confused. "Sophisticated purchasers of the products enter the marketplace in search of specific products for specific industrial purposes. The sophistication of these purchasers makes the likelihood of confusion remote."

Haydon Switch & Instrument, Inc. v. Rexnord, Inc., 4 U.S.P.Q.2d 1510 (D. Conn.

1987)

54.   McCarthy states:

Where the relevant buyer class is composed of professionals or commercial
buyers familiar with the field, they are sophisticated enough not to be
confused by trademarks that are closely similar

McCarthy on Trademarks, supra § 23:01; Electronic Design & Sales, Inc.

v. Electronic Data Systems Corp., 954 F.2d 713, 21 U.S.P.Q.2d 1388 (Fed.

Cir. 1992) (no likelihood of confusion where plaintiff sold "E.D.S."

computer services to experienced corporate officials after significant study

and contractual negotiation, while defendant sold "EDS" power supplies and

battery chargers to OEMs.)

55.   Furthermore, where the cost of a party's product is high, courts assume that

purchasers are likely to be more discriminating and less likely to be confused.

Gilson, supra, §5.08[4]. Gilson writes:

> [W]here a purchaser is buying an expensive product, he is
> likely to be deliberate in his product selection and therefore in
> his differentiation between trademarks. He is normally thought
> to take greater time in purchasing, to investigate all of the
> facts, to shop for competing products, and to spend his money
> only when he is convinced that a particular trademarked
> product is precisely what he wants. These purchasing habits,
> to be contrasted sharply with 'impulse' purchases made on the
> spur of the moment, are generally thought to reduce the
> likelihood that the purchaser will be confused.

<u>Id</u>.

56.     The evidence shows that the plaintiff's products are sold to a highly sophisticated

        class of buyers who spend months and even years deciding on the product.

        Ultimately, these consumers will spend $495.00 for the plaintiff's product, and

        upwards of $12,000.00 for the entire system. These highly sophisticated purchasers

        are not likely to be confused by the defendant's use of the phrase within the

        PRECISION MAPPING™ software. Gilson, <u>supra</u> at § 5.08[2] (confusion less

        likely among sophisticated, discriminating buyers).

57.     Evidence that the plaintiff's and defendant's products are sold in the same or similar

        retail outlets would also be relevant to the determination of likelihood of confusion.

        <u>Pebble Beach</u>, <u>supra</u> at 1561. There is no evidence, however, that these two

        products have ever been sold in the same or similar retail outlets. Furthermore,

        there is no evidence that the plaintiff's product was ever even sold in a store.

58.     The Court will also consider the identity of advertising media. <u>Id</u>. at 1561. There

        is sparse evidence that the plaintiff's and defendant's products have ever appeared

        in the same trade journals, and where they did, they normally appeared in different

        product categories.

59.     The Court will also examine the defendant's intent in determining likelihood of

        confusion. <u>Elvis Presley Enterprises, Inc.</u>, 141 F.3d at 203; <u>Pebble Beach</u>, <u>supra</u>

        at 1561. The relevant inquiry is whether the defendant intended to confuse or

mislead consumers in order to derive undue benefit. Moore Business Forms, Inc. v. Ryu, 960 F.2d 486, 491 (5th Cir. 1992) (the intent factor was of little relevance when there was no credible evidence that the defendant had intentionally adopted the mark in order to derive undue benefit); see also, McCarthy on Trademarks, supra § 23:110 (intent of infringer to gain through confusing customers is relevant to issue of likelihood of confusion). The Court finds that there is no evidence that in using the phrase GPS Link, the defendant intended to mislead, confuse or deceive the consumers into believing that the defendant's product was actually from the plaintiff, or that it was somehow affiliated with the plaintiff. Relevant to this determination is the fact that there is no evidence that the defendant would or could derive any benefit from such confusion, considering the great disparity in products and consumers.

60.  Evidence of actual confusion is not necessary to a finding of a likelihood of confusion, but it is nevertheless the best evidence of a likelihood of confusion. Such evidence would be both relevant and probative. Service Merchandise Co. v. Service Jewelry Store, Inc., 737 F. Supp. 983, 992 (S.D. Tex. 1990).

61.  Evidence that a consumer was not actually confused, but inquired of the plaintiff as to an affiliation between the parties is relevant but is not sufficient to show actual confusion. McCarthy states:

> The better view would seem to be that while enquiry evidence

> is admissible and relevant, standing alone with no other
> evidence it is insufficient proof of actual confusion. Such
> enquiries alone reveal a less than totally "confused" state of
> mind of the enquiring persons.

McCarthy, supra § 23:16. Evidence that a single individual inquired

regarding affiliation is insufficient as a matter of law. Pignons S.A. de

Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 212 U.S.P.Q. 246

(1st Cir. 1981) (inquiry as to affiliation may indicate confusion but only one

such incident is "clearly insufficient"); Jordache Enters. v. Hogg Wyld, Ltd.,

828 F.2d 1482, 4 U.S.P.Q.2d 1216 (10th Cir. 1987) (evidence of inquiries

are entitled to little weight and is of comparatively little value). The plaintiff

has not provided sufficient evidence of actual confusion.  IGT did not

present any survey evidence, and the plaintiff's one witness who testified of

confusion as to affiliation is insufficient as a matter of law to prove actual

confusion.

## CONCLUSION

62.     For the reasons stated above, the Court holds that the plaintiff failed to produce

sufficient evidence at trial that it had a protectable trademark in the term "GPS-

LINK" because it is a descriptive term that lacks secondary meaning. Thus, the

defendant is entitled to judgment as a matter of law on all of the plaintiff's Federal

Trademark and Unfair Competition claims (Counts 1 and 2), and the plaintiff's state

law claims for dilution, common law trademark infringement, for an injunction and for an accounting (Counts 3, 4, 5 and 6). The Court further finds that the defendant is entitled to judgment as a matter of law on all of the plaintiff's claims on the alternative theory that the plaintiff has failed to meet its burden of proof for likelihood of confusion. Accordingly, the Court hereby

ORDERS that the Motion for Judgment as a Matter of Law is GRANTED.


SIGNED at Houston, Texas on this the ___**27**___ day of August, 1999.



_____
DAVID HITTNER
United States District Judge

47